**No.: 25-12041-EE**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

GREGORY LIGHT,

*Appellant*,

v.

LVNV FUNDING, LLC and ANDREU PALMA LAVIN & SOLIS, PLLC

*Appellees.*

On Appeal from the United States District Court for the Southern District of Florida,
No.: 0:24-cv-61655-AHS

---

## APPELLANT'S INITIAL BRIEF

---

**LIGHT & GONZALEZ, PLLC**
Gregory Light, Esq.
Florida Bar No. 120907
87151 W. Broward Blvd. #206
Plantation, FL 33324
(754) 900-6545
service@lightgonzalezlaw.com
greg@lightgonzalezlaw.com
*Appellant and Counsel for Appellant*

## CERTIFICATE OF INTERESTED PARTIES

Appellant Gregory Light, Esq., pursuant to 11th Cir. R. 26.1-1 and Fed. R. App. P. 26.1, hereby certify that the following is a full and complete list of all trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations (including those related to a party as a subsidiary, conglomerate, affiliate, or parent corporation) having either an interest in the outcome of this case, a financial interest in or other interest which could be substantially affected by the outcome of this particular case:

1. Andreu Palma Lavin & Solis, PLLC, Appellee;

2. Anthony Gonzalez, Esq., Counsel for Appellant;

3. Gregory Light, Esq., Appellant;

4. John M. Marees, Esq., Counsel for Appellee;

5. Lauren Marshall Burnette, Esq., Attorney for Appellee;

6. Light & Gonzalez, PLLC, Counsel for Appellant;

7. LVNV Funding, LLC, Appellee;

8. Maureen B. Walsh, Esq., Counsel for Appellee;

9. Messer Strickler Burnette, Ltd., Counsel for Appellee;

10. Sheman Originator, LLC; Affiliate of LVNV Funding, LLC;

11. The Honorable Raaj Singhal, United States District Judge for the Southern District of Florida.

1

## STATEMENT REGARDING ORAL ARGUMENT

This case presents significant questions concerning a non-consumer's statutory standing to bring claims pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* and when a non-consumer's injuries are sufficient to establish Article III standing.  These issues have not been authoritatively decided by this Court since *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417, 141 S. Ct. 2190, 2200 (2021), and oral argument will enable comprehensive argument and discussion of the historical and common law injuries caused by unfair debt collection practices and aid in this Court's decisional process.

## TABLE OF CONTENTS

| Description | Pages |
|---|---|
| Table of Citations | 5–12 |
| Statement of Subject Matter and Appellate Jurisdiction | 13 |
| Statement of the Issues | 14 |
| Statement of the Case and Facts | 15–26 |
| Summary of the Argument | 27 |
| Argument and Citations of Authority | 28–62 |
| I. Historical Background of Debt Collection Including Its Affect on Non-Debtors | 28–33 |
| II. Debt Collection Practices Affecting Non-Debtors Since the FDCPA | 33–37 |
| III. Mr. Light has Statutory Standing to Bring his Claims against LVNV and Defendant Firm's Violations of 1692e, 1692d, and 559.72 | 37–54 |
| A. Mr. Light, and other Non-Consumers, are Within the Zone of Interest Congress Sought to Protect Under the FDCPA | 39–42 |
| B. Mr. Light's Claims Are Actionable Under the FDCPA | 43–49 |
| i. Mr. Light's False and Misleading Representation Claims Under §1692e | 46–47 |
| ii. Mr. Light's Harassment and Abuse Claims Under §1692d | 47–48 |
| iii. Mr. Light's FCCPA Claims Are Also Actionable | 48–49 |
| | 49–52 |

3

C. *The District Court's "Injurious Exposure" Pleading Requirement Is Erroneous*

52–54

D. *Mr. Light Stood in the Consumer's Shoes as his Attorney in the Debt Collection Lawsuit*

54–62

IV.    Mr. Light Has Article III Standing to Bring his Claims in Federal Court

56–58

A. *Debt Collection Practices Have Been at Center of Cases and Controversies Throughout History and Served as Basis to Seek Redress in A Lawsuit*

58–62

B. *Mr. Light's Claims Are Analogous to Common Law Claims that Provided Basis to Seek Redress in A Lawsuit*

Conclusion                                                    62

Certificate of Compliance                                     63

Certificate of Service                                        64

4

# TABLE OF CITATIONS

**Case Citations and Authority**                                            **Pages**

*Acheson Hotels, LLC v. Laufer*,
    601 U.S. 1, 144 S. Ct. 18 (2023) — 61

*Agrelo v. Affinity Mgmt. Servs., LLC*,
    841 F.3d 944 (11th Cir. 2016) — 38

*Allen ex rel. Martin v. LaSalle Bank, N.A.*,
    629 F.3d 364 (3d Cir. 2011) — 52

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) — 25

*Association of Data Processing Service Organizations, Inc. v. Camp*,
    397 U. S. 150, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970) — 41

*AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
    494 F.3d 1356 (11th Cir. 2007) — 50

*Atkinson v. Garland*,
    70 F.4th 1018 (7th Cir. 2023) — 57

*Bank of Am. Corp. v. City of Miami*,
    581 U.S. 189, 137 S. Ct. 1296 (2017) — 39, 41

*Bank v. Pentagroup Financial, LLC,*
    2009 U.S. Dist. LEXIS 47985 — 51

*Bishop v. Ross Earle & Bonan, P.A.*,
    817 F.3d 1268 (11th Cir. 2016)    * — 36–37, 52–54, 59

*Clark v. Associated Retail Credit Men*,
    105 F.2d 62 (D.C. Cir. 1939) — 58

*Crawford v. LVNV Funding, LLC*,
    758 F.3d 1254 (11th Cir. 2014) — 36, 45

*Davis v. Prof'l Parking Mgmt. Corp.*,  No. 22-14026, — 56

2023 U.S. App. LEXIS 17944, (11th Cir. July 14, 2023)

*DiNaples v. MRS BPO, L.L.C.*,                                                38
    934 F.3d 275 (3d Cir. 2019)

*Estate of Burpo v. Specialized Loan Servicing, LLC*,                        49–50
    2025 U.S. Dist. LEXIS 58810(N.D. Ala. 2025)

*Evory v. RJM Acquisitions Funding L.L.C.*,                                  43, 46, 49,
    505 F.3d 769 (7th Cir. 2007)                                          52–53

*FDA v. R.J. Reynolds Vapor Co.*,                                            39, 41
    145 S. Ct. 1984, 1990-91 (2025)

*Glover v. Ocwen Loan Servicing, LLC*,                                       41–42
    127 F.4th 1278 (11th Cir. 2025)

*Guerrero v. RJM Acquisitions LLC,*                                          47, 53
    499 F.3d 926 (9th Cir. 2007)

*Ham v. Portfolio Recovery Assocs., LLC*,                                    39–40
    308 So. 3d 942 (Fla. 2020)

*Heintz v. Jenkins*,                                                         36
    514 U.S. 291, 115 S. Ct. 1489, 131 L. Ed. 2d 395 (1995)

*Henson v. Santander Consumer USA Inc.*,                                     38
    582 U.S. 79, 137 S. Ct. 1718, 198 L. Ed. 2d 177 (2017

*Hunstein v. Preferred Collection & Mgmt. Servs.*,                           25–26
    48 F.4th 1236 (11th Cir. 2022)

*Jeter v. Credit Bureau, Inc.*,                                             42
    760 F.2d 1168 (11th Cir. 1985)

*Lamar, Archer & Cofrin, LLP v. Appling,*                                    39–40
    138 S. Ct. 1752, 201 L. Ed. 2d 102 (2018)

*Lamirand v. Fay Servicing, LLC*,                                           25
    38 F.4th 976 (11th Cir. 2022)

*Lexmark Int'l, Inc.* v. *Static Control Components,* Inc.,                     39
    572 U. S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014)

*Light v. Seterus, Inc.,*                                                       44
    337 F. Supp. 3d 1210 (S.D. Fla. 2018)

*Lujan v. Defs. of Wildlife,*                                                   25
    504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)

*Magdy v. I.C. Sys.,*                                                        45–46
    47 F.4th 888 (8th Cir. 2022)

*Manuel v. Merchants & Prof'l Bureau, Inc.,*                                    38
    956 F.3d 822 (5th Cir. 2020)

*Midland Funding, LLC v. Johnson,*                                              36
    581 U.S. 224, 137 S. Ct. 1407, 197 L. Ed. 2d 790 (2017)

*Miljkovic v. Shafritz & Dinkin, P.A.,*                                   24, 36, 39–
    791 F.3d 1291 (11th Cir. 2015)   *                             45, 49, 54,
                                                                       59

*Morales v. Trans World Airlines, Inc.,*                                        40
    504 U.S. 374,112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992)

*Muransky v. Godiva Chocolatier, Inc.,*                                         25
    979 F.3d 917 (11th Cir. 2020)

*O'Rourke v. Palisades Acq. XVI, LLC,*                                          53
    635 F.3d 938 (7th Cir. 2011)

*Rivas v. Midland Funding, LLC,*                                                45
    842 F. App'x 483 (11th Cir. 2021)

*Russell v. Absolute Collection Servs., Inc.,*                                  38
    763 F.3d 385 (4th Cir. 2014)

*Sayyed v. Wolpoff & Abramson,*                                                 52
    485 F.3d 226 (4th Cir. 2007)

7

*Sclafani v. BC Services, Inc.*,                                                                 51–52
    *2*010 U.S. Dist. LEXIS 115330 (S.D. Fla. 2010)

*Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C.*,                   51
    155 Fed. Appx. 10 (2nd Cir. 2005)

*Spokeo, Inc. v. Robins*,                                                                          50, 55
    578 U.S. 330, 136 S. Ct. 1540 (2016)

*Taylor v. Fin. Recovery Servs., Inc.*,                                                      38
    886 F.3d 212 (2d Cir. 2018)

*Todd v. Collecto, Inc.*,                                                                            40-41
    731 F.3d 734 (7th Cir. 2013)

*TransUnion LLC v. Ramirez*,                                                                2, 55–56
    141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021)

*United States v. DBB, Inc.*,                                                                    40
    180 F.3d 1277 (11th Cir. 1999)

*United States v. Oregon*,                                                                        50
    671 F.3d 484 (4th Cir. 2012)

*United States v. Sanchez*,                                                                      50
    2023 U.S. App. LEXIS 23976 (11th Cir. Sept. 11, 2023)

*Urbina v. Nat'l Bus. Factors Inc.*,                                                          38
    979 F.3d 758 (9th Cir. 2020)

*Wise v. Zwicker & Assocs.*, P.C.,                                                            38
    780 F.3d 710 (6th Cir. 2015)

*Wright v. Fin. Serv. of Norwalk, Inc.*,                                                    53
    22 F.3d 647 (6th Cir. 1997)

## Statutory Citations and Authority

| | |
|---|---|
| 2 Stat. 19 §2 | 57–58 |
| 15 U.S.C. §§ 1692 | 2, 13, 15 |
| 15 U.S.C. § 1692c(a) | 37 |
| 15 U.S.C. § 1692(e) | 36 |
| 15 U.S.C. § 1692a | 46 |
| 15 U.S.C. § 1692b | 37 |
| 15 U.S.C. § 1692e | 24, 27, 36–38, 43–48, 59 |
| 15 U.S.C. § 1692d | 24, 27, 37, 38, 40, 43–45, 47–49, 51 |
| 15 U.S.C. § 1692k | 24, 27, 40, 41, 43 |
| §§559.55, Fla. Stat. | 15 |
| §559.553(1), Fla. Stat | 47 |
| §559.72(9), Fla. Stat. | 48 |

## Sources in Legislative History

| | |
|---|---|
| 122 Cong. Rec. 21741 (1976) | 32, 34 |
| H.R. Rep. No. 131, 95th Cong. 1st Sess. 8 | 42 |
| Hrg. On H.R. 11969, The Debt Collection Practices Act, before the Subcommittee on Consumer Affairs of the Committee on Banking, Currency and Housing, House of Representatives, 94th Cong. 2nd Sess., March 30, 1976 | 32 |
| Richard B. Spohn, Director of California State Department of Consumer Affairs, Sacramento, California, p. 87, Hearings Before the Subcommittee on Consumer Affairs of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, Ninety-Fifth Congress, First Session (Feb. 8–10, 1977) | 32 |
| S. Rep. No. 382, 95th Cong. 1st Sess. 2 | 42 |
| Hrg. On H.R. 11969, before the Subcommittee on Consumer Affairs of the Committee on Banking, Currency and Housing, House of Representatives, The Debt Collection Practices Act, Statement of Lewis H. Goldfarb, Deputy Assistant Director, Division of Special Statutes, Bureau of Consumer Protection, Federal Trade Commission; Accompanied by Jared Blum, Staff Attorney, General Counsel's Office, Federal Trade Commission, 94th Cong. 2nd Sess., April 7, 1976 | 60 |
| *Use of Telephones for Debt Collection Purposes*, Public Notice 70-609, 35 Fed. Reg. 9873 (June 10, 1970). | 33 |

## Secondary Sources

| | |
|---|---|
| JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) | 56–57 |
| ARTICLE: ASSEMBLY-LINE PLAINTIFFS + 135 Harv. L. Rev. 1704 | 34–35 |

ARTICLE: THE DEMOCRATIC (IL)LEGITIMACY OF
ASSEMBLY-LINE LITIGATION,                                          34–35, 37
    135 Harv. L. Rev. F. 359

BRUCE H. MANN,                                                    30-31
    REPUBLIC OF DEBTORS: BANKRUPTCY IN THE AGE OF
    AMERICAN INDEPENDENCE (Cambridge, MA: Harvard
    University Press, 2002)

CHARLES PAGE SMITH,                                                    31
    JAMES WILSON: FOUNDING FATHER, 1742-1798 (1956)

DANIEL L. DREISBACH,                                              29-30
    READING THE BIBLE WITH THE FOUNDING FATHERS (Oxford:
    Oxford University Press, 2016)

*Imprisonment for Debt*,                                              30
    11 Am. Jurist & L. Mag. 289 (1834)

J. Shane Creamer & Joel G. Weisberg, Att'y Gen., Commonwealth of      60–61
Pa.,
    Debt Collection Abuses in Pennsylvania - The Need for No-
    Threat Legislation (1971)

Jake Halpern,                                                         33
    *Pay Up: A Debt Collector Struggles to Stay Out of Debt*, NEW
    YORKER (Oct. 11, 2010),
    http://www.newyorker.com/magazine/2010/10/11/pay-up,
    archived at http://perma.cc/353G-DRYL

James Madison,                                                    56–57
    Notes of Debates in the Federal Convention of 1787, *in* 2 The
    Records of the Federal Convention of 1787, at 489 (Max
    Farrand ed.)

    The Federalist No. 42

Jill Lepore,                                                      29–31
    I.O.U.: How We Used to Treat Debtors, NEW YORKER
    (Apr. 13, 2009),

http://www.newyorker.com/magazine/2009/04/13/i-o-u,
*archived at* http://perma.cc/HGG7-ABQL

King James Bible                                                               29

Pamela Fooley et al.,                                                          34
    ARTICLE: LIFE IN THE SWEATBOX, 94 Notre Dame L.
    Rev. 219

PETER J. COLEMAN,                                                             30
    DEBTORS AND CREDITORS IN AMERICA: INSOLVENCY,
    IMPRISONMENT FOR DEBT, AND BANKRUPTCY, 1607–1900
    (1974)

Restatement of the Law, Torts § 525                                           59

Restatement of the Law, Torts § 766                                           58

RICK JURGENS & ROBERT J. HOBBS, NAT'L CONSUMER L. CTR.                        35
    THE DEBT MACHINE: HOW THE COLLECTION
    INDUSTRY HOUNDS CONSUMERS AND
    OVERWHELMS COURTS (2010) *available at*
    [https://perma.cc/SMR4-Q6G5]

Roland Obenchain,                                                            28
    *Roman Law of Bankruptcy*, 3 Notre Dame L. Rev. 169a, 174–76
    (1928) *available at*:
    http://scholarship.law.nd.edu/ndlr/vol3/iss4/1

The Code of Hammurabi King of Babylon: About 2250 B.C.                    28–29
    §§ 113–17 (Robert Francis Harper trans., 2d ed. 1904)

U.S. FED. TRADE. COMM'N,                                                     34
    COLLECTING CONSUMER DEBTS: THE CHALLENGES OF
    CHANGE- A WORKSHOP REPORT (Feb. 2009), *available at*
    http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The District Court had subject matter jurisdiction for the claims brought under 15 U.S.C. §§ 1692, *et seq.* pursuant to 28 U.S.C. § 1331. The District Court had supplemental jurisdiction over the state law claims brought under Fla. Stat. §§ 559.55, *et seq* pursuant to 28 U.S.C. § 1367. This Court has jurisdiction over the issues raised in this appeal pursuant to 28 U.S.C. § 1291, as the District Court entered a final order on May 12, 2025, granting the Appellees' Motion to Dismiss which disposed of all the parties' claims and directed the clerk to close the case. Appellant timely noticed his appeal on June 11, 2025.

## STATEMENT OF THE ISSUES

1.       Did the District Court err in granting Appellees' Motion to Dismiss by finding that Gregory Light, Esq., who served as a debtor's legal counsel in a state court debt collection proceeding, did not have statutory standing under the Fair Debt Collection Practices Act and Florida Consumer Collection Practices Act to bring his claims?

2.       Did the District Court err in granting Appellees' Motion to Dismiss by finding that Gregory Light, Esq., who served as a debtor's legal counsel in a state court debt collection proceeding, lacked constitutional standing under Article III to bring his claims for violations of the Fair Debt Collection Practices Act and Florida Consumer Collection Practices Act?

**STATEMENT OF THE CASE AND FACTS**

This is an appeal of a final order dismissing Gregory Andrew Light, Esq.'s ("Mr. Light" or "Appellant") First Amended Complaint ("FAC") wherein he sought to recover damages from LVNV Funding, LLC ("LVNV") and Andreu Palma Lavin & Solis, PLLC ("Defendant Firm") for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA") and the Florida Consumer Collection Practices Act. Fla. Stat. §§559.55 *et seq.* ("FCCPA"). In his FAC, Mr. Light alleges LVNV and Defendant's firm's actions and inactions, which occurred during the course of an underlying debt collection lawsuit brought against Mr. Light's client and friend, violated state and federal consumer collection laws and give Mr. Light the personal right seek redress in federal court.[1]

## A. *Statement of Facts*

Relevant to this appeal, Mr. Light alleged the following facts in support of his claims for relief. Mr. Light is an attorney licensed to practice law in the State of Florida, and who regularly provides legal representation to individuals allegedly obligated to pay consumer debts. DE-7 ¶¶18–19. Mr. Light has developed an excellent reputation as a debtor's rights attorney in the South Florida both with consumers and his peers within the South Florida legal community. DE-7 ¶20. Mr. Light takes great pride in the work

---

[1] Citations to the record herein appear in the following form: "DE-__" The blank refers to the ECF docket number, including any subdocument number assigned by the Pacer system, followed by either ECF-generated page number in the header or an enumerated paragraph in that document.

he has done to help consumers as well as the reputation he and his firm have developed since he co-founded Light & Gonzalez, PLLC in January of 2017. DE-7 ¶21. Due to this reputation, Mr. Light's friends, family and colleagues regularly consult with him for their own individual legal matters on debtor's rights related issues. DE-7 ¶23. One such person was Franklyn Rodriguez ("Mr. Rodriguez") who knew Mr. Light from having previously done handy-man work for Mr. Light and his family, and who Mr. Light considers his friend. DE-7 ¶¶ 29, 72, 73, 108. After LVNV filed multiple separate lawsuits against Mr. Rodriguez to collect debts they alleged he owed them, Mr. Rodriguez retained Mr. Light to represent him in those proceedings. DE-7 ¶24. The actions and inactions that occurred in one those proceedings underlies Mr. Light's, now dismissed, claims for relief.

On April 14, 2023 LVNV, through their agents/counsel at Defendant Firm, initiated a civil action in state court to collect a consumer debt from Mr. Rodriguez ("Debt Collection Lawsuit"). DE-7 ¶45.[2] The debt LVNV and Defendant Firm alleged Mr. Rodriguez was obligated to pay arose out of transactions incurred for personal, family or household purposes. DE-7 ¶46. Mr. Rodriguez engaged Mr. Light to represent him in the Debt Collection Lawsuit shortly before a scheduled pre-trial conference was scheduled to occur on August 23, 2023. DE-7 ¶48. Immediately

---

[2] Citations to the record herein appear in the following form: "DE-__" The blank refers to the ECF docket number, including any subdocument number assigned by the Pacer system, followed by either ECF-generated page number in the header or an enumerated paragraph in that document.

thereafter, Mr. Light contacted LVNV through their retained legal counsel at Defendant Firm in an attempt to resolve the Debt Collection Lawsuit and an agreement was reached to resolve the claims. DE-7 ¶¶49, 50. Defendant Firm represented to Mr. Light that it would inform the trial court presiding over the Debt Collection Lawsuit of the parties' agreement at the scheduled pretrial conference. DE-7 ¶50. Based upon these representations and assurances, and in an effort to avoid the additional costs and expenses of attending the pretrial conference hearing, Mr. Light did not attend the pretrial conference. DE-7 ¶51.

Following the scheduled pre-trial conference, the court presiding over the Debt Collection Lawsuit entered its Order of Default against Mr. Rodriguez for failure to appear at the hearing. DE-7 ¶52; DE-7-2 p. 2. The Order of Default was furnished directly to Mr. Light's individual email address: greg@lightgonzalezlaw.com. DE-7-1 pp. 29. Upon receiving service of the Order of Default, Mr. Light immediately contacted Defendant Firm to inquire into what occurred at the pretrial conference. In response to the inquiry Defendant Firm responded that their coverage counsel had not followed their instructions, but that Defendant Firm would make sure the Order of Default was set aside. DE-7 ¶53; DE-7-2 pp. 14-15. Defendant Firm's representations were directed to Mr. Light and sent to Mr. Light's individual email address: greg@lightgonzalezlaw.com. DE-7-2 pp. 14-15. Based upon Defendant Firm's representations and assurances it would seek to set aside the Order of Default, Mr. Light did not draft or file a motion in the Debt Collection lawsuit to have the Order of

Default set aside. DE-7 ¶¶54, 86, 89. Subsequently, LVNV and Defendant Firm provided Mr. Light with a draft settlement agreement, which Mr. Rodriguez executed, and Mr. Light returned to Defendant Firm on September 5, 2023. DE-7 ¶55.

Although Mr. Rodriguez and LVNV had agreed to resolve the claims asserted in the Debt Collection Lawsuit and LVNV and Defendant Firm were now in possession of the executed settlement agreement, on September 6, 2023 LVNV and Defendant Firm moved to have a default final judgment entered against Mr. Rodriguez in the Debt Collection Lawsuit. DE-7 ¶56; DE 7-7. In the motion LVNV and Defendant Firm request the entry of a Default Final Judgment "…for Defendant's failure to appear at the pre-trial hearing/mediation…", even though this failure to appear was induced by the Defendant Firm's own inactions and misrepresentations. DE-7 ¶59; DE-7-3 p. 1.; DE-7 ¶51; DE 7-7 pp. 8-9. The motion made no mention of the agreement between Mr. Rodriguez and LVNV, and included sworn representations as to amounts owed on the account which were untrue. DE-7 ¶¶61–65, 83–85; DE 7-7 pp. 8-9. The Motion for Entry of Default Final Judgment, Affidavit of Costs, Notice of Filing Affidavit of Proof, and Non-Military Affidavit were sent directly to Mr. Light to his individual email address: greg@lightgonzalezlaw.com. DE 7-7 p. 2.

Upon receipt of the motion requesting entry of a default final judgment, Mr. Light immediately contacted LVNV through their attorneys at Defendant Firm to inquire into the submission of this motion, why a motion to set aside the default had not been filed, and whether LVNV would be countersigning the settlement agreement.

18

DE-7 ¶66.  Mr. Light stressed the urgency of circumstances and that he would be required to take time from other work to respond to their motion.  DE-7-1 p. 29.  Defendant Firm responded that this motion was not supposed to be submitted, and that it would be withdrawn.  DE-7 ¶67; DE-7-1 p. 29.  Defendant Firm also confirmed that LVNV would be countersigning the settlement agreement. DE-7 ¶67; DE-7-1 p. 29.   These communications were sent directly to Mr. Light's email address: greg@lightgonzalezlaw.com.  DE-7-1 p. 29.  Based upon LVNV and Defendant Firm's representations, Mr. Light did not move to set aside the default or respond to the motion for entry of default final judgment. DE-7 ¶¶ 86, 89.

On September 12, 2023, the fully executed settlement agreement, countersigned by LVNV on September 6, 2023, was returned to Mr. Light via electronic mail.  DE-7 ¶68.  However, later that same evening, the trial court presiding over the Debt Collection Lawsuit entered Default Final Judgment against Mr. Rodriguez.  DE-7 ¶69.  The Default Final Judgment was entered upon the motion LVNV and Defendant Firm told Mr. Light it would withdraw.  DE-7 ¶69.  The Default Final Judgment was entered even though the claims LVNV alleged in the Debt Collection Lawsuit had been settled. DE-7 ¶¶50, 68.  Defendant Firm and LVNV misrepresented the character, amount and legal status of the debt when they requested the entry of the Default Final Judgment. DE-7 ¶84.   Defendant Firm and LVNV misrepresented the character, amount and legal status of the debt when they requested the entry of the Default Final Judgment. DE-7 ¶84.  Defendant Firm and LVNV knew the debt it sought to enforce through the

entry of the Default Final Judgment was illegitimate due to the settlement.  DE-7 ¶¶87, 113.  Defendant Firm and LVNV also knew they were not seeking to collect a legitimate debt because they had mispresented attorney's fees as "court costs" in their submissions.  DE-7 ¶¶85, 114.

Mr. Light received the Default Final Judgment via electronic mail at 7:15 p.m. on September 12, 2023 after he arrived home from work and reviewed it shortly thereafter. DE-7 ¶69.[3]  Upon his review, Mr. Light was initially apoplectic from the anger and indignation he felt as a consequence of LVNV and Defendant Firm's conduct which had now led to the entry of a final judgment against his client and personal friend Mr. Rodriguez.  DE-7 ¶70.  Mr. Light planned to spend these evening hours enjoying time with his family, having dinner, and helping his young children through their bedtime routines, but due to what had just transpired Mr. Light was too overcome with worry and anxiousness to enjoy this time with his family.  DE-7 ¶71.  The next day, Mr. Light's indignation transformed into more worry, but also embarrassment and regret, as he was preoccupied with best way to go about vacating the judgment, and how he could even begin to attempt to explain what has transpired to his client and friend Mr. Rodriguez. DE-7 ¶72.

Mr. Light felt manipulated and deceived, as he now believed that LVNV and Defendant Firm had intentionally induced his inaction in the Debt Collection Lawsuit

---

[3] Composite Exhibit H, which is referred to in paragraph 69, was inadvertently not attached to the FAC and consequently is not part of the record on appeal.

to gain leverage in their attempts to collect monies from Mr. Rodriguez. DE-7 ¶74. It also appeared to Mr. Light that LVNV and Defendant Firm had mispresented the court costs incurred in the Debt Collection Lawsuit. DE-7 ¶85. Additionally, Mr. Light felt that he had let down Mr. Rodriguez on both a personal and professional level. DE-7 ¶73.

Mr. Light spent hours preparing a motion to vacate the default final judgment, filed it, and set the motion for a specially set evidentiary hearing. DE-7 ¶¶75–77. The time spent on this motion was only made necessary by LVNV or Defendant Firm's actions and inactions. Months passed after the motion was filed without any action or communication from LVNV or Defendant Firm. DE-7 ¶77. Throughout this time, Mr. Light remained unsure whether the time spent on the motion or attending the hearing would be compensated, and Mr. Light was uncomfortable with asking his friend to compensate him for the time spent given the circumstances. DE-7 ¶75.

Throughout the entire course of the Debt Collection Lawsuit, Defendant Firm was operating as an unlicensed consumer collection agency having failed to obtain a license to engage in the business of collecting consumer debts in Florida pursuant to Fla. Stat. §559.555. DE-7 ¶92. Defendant Firm and LVNV took actions and made representations in furtherance of their attempts to collect debts from Mr. Rodriguez even though Defendant Firm was legally prohibited from engaging in the business of collecting consumer debts. DE-7 ¶¶99–102. Consequently, all of Defendant Firm and

21

LVNV attempts to collect from Mr. Rodriguez were illegal and an actual and proximate cause of Mr. Light's damages. DE-7 ¶¶103–105.

LVNV and Defendant Firm's false and misleading representations, harassment and abuse in connection with the Debt Collection Lawsuit have caused Mr. Light to suffer embarrassment, humiliation, indignation, damage to his personal and professional reputation, and worry about damage to his personal and professional reputation. Mr. Light is filled with professional and personal self-doubt and regret over what transpired and has suffered a loss in enjoyment of his professional life as a practicing attorney. DE-7 ¶¶78–80, 108–111. Although the Default Final Judgment had been obtained through unfair, deceptive and unconscionable means, Mr. Light continues to worry that the events reflect poorly on his personal and professional reputation. DE-7 ¶78. The totality of the events that occurred in the Debt Collection Lawsuit have become a source of embarrassment and humiliation for Mr. Light. DE-7 ¶78. As alleged in the FAC, Mr. Light is keenly aware of the sordid history of unfair, deceptive, and morally repugnant practices utilized by debt collectors for hundreds of years, *see* DE-7 ¶¶1–5, and is embarrassed that even knowing about this history he still fell victim to LVNV and Defendant Firm's unfair, abusive, deceptive, and misleading debt collection practices.

### B. *Course of Proceedings*

Mr. Light initiated his action in the District Court on September 6, 2024, and filed his FAC on December 3, 2024. On February 7, 2025, LVNV and Defendant Firm

moved to dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(6) arguing that Mr. Light lacks statutory standing to bring his claims, and also that his FCCPA claims are barred by Florida's litigation privilege.  DE-18 ¶¶1–6.

In support of their motion LVNV and Defendant Firm did not argue to the District Court that Mr. Light had failed to allege facts to support Article III standing; rather its arguments were confined the Mr. Light's statutory standing under the FDCPA and FDCPA, i.e. whether Congress has accorded Mr. Light the right to sue the defendants to redress his injuries.  DE-18 pp. 4–5.  LVNV and Defendant Firm argued that Mr. Light is not a consumer, and that FDCPA was enacted primarily to protect consumers.  DE-18 pp. 5–6.  Although admitting that non-consumers may bring claims for violations of the FDCPA under circumstances, they argue that Mr. Light had not sufficient plead "injurious exposure" to their debt collection activities.  DE-18 pp. 6–7. According to LVNV and Defendant Firm, Mr. Light's exposure was "completely incidental to his representation of Mr. Rodriguez—in other words, Mr. Light is 'exposed' to debt collection activity because he represents consumers in debt collection lawsuits."  DE-18 p. 7.  LVNV and Defendant Firm's actions and inactions, they argue, were not personal, meaningful, or individualized enough to provide Mr. Light with statutory standing to bring his claims.  DE-23 pp. 3–4.  For identical reasons,  LVNV and Defendant Firm also argued that Mr. Light lacked statutory standing to bring claims under the FCCPA.  DE-18 p. 8.

In response to the argument regarding his statutory standing to bring claims under the FDCPA and FCCPA, Mr. Light argued that *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1301 (11th Cir. 2015) was controlling. DE-20 pp. 4–7. Mr. Light argued that in *Miljkovic*, this Court had determined that debt collectors were prohibited from engaging in the conduct described in §1692d, §1692e and §1692f regardless of who their actions were directed towards. DE-20 pp. 4–7. Additionally, this Court had determined pursuant to §1692k "any person" harmed by prohibited conduct are entitled to redress under the FDPCA. DE-20 p. 5. "In the absence of any language to the contrary, a consumer's attorney is undoubtedly 'any person.'" DE-20 p. 5 (quoting *Miljkovic* at 1300). Mr. Light too, is undoubtedly, any person. DE-7 ¶17.

In dismissing the FAC, District Court agreed with LVNV and Defendant Firm and held that Defendants had not caused Mr. Light to suffer a particularized injury. DE-25 p. 6. The District Court also ruled Mr. Light's injuries were insufficient under Article III: "In the legal profession, a claim of stress and mental anguish by a lawyer on a side that didn't have the case go smoothly does not equate to Article III standing." DE-25 p. 7. While it was not condoning the debt collectors' actions, the District Court supports its reasoning by analogizing Mr. Light claims and to a criminal defense attorney seeking redress when a state prosecutor secures a wrongful conviction:

> This is ***not*** to condone defendant's actions on the state court case, but for example, certainly a criminal defense attorney doesn't file a ***personal*** claim in federal court every time a state prosecutor secures a wrongful conviction. And, a wrongful conviction is unfortunately not all that rare of an occurrence, and far more consequential.

24

DE-25 p. 7 (Emphasis in original).  The Court dismissed Mr. Light's FCCPA claims for the same reason. DE-25 p. 7.[4]

The Court's Order was entered on May 12, 2025, and Mr. Light timely filed his Notice of Appeal on June 11, 2025.

### C. Standard of Review

This Court reviews "a dismissal for failure to state a claim de novo, accepting as true factual allegations in and documents attached to the complaint." *Lamirand v. Fay Servicing, LLC*, 38 F.4th 976, 979 (11th Cir. 2022). "A complaint survives a motion to dismiss if it states 'a claim to relief that is plausible on its face'—in other words, if its factual allegations allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id. (quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

This Court reviews Article III standing de novo. *Muransky v. Godiva Chocolatier, Inc.,* 979 F.3d 917, 923 (11th Cir. 2020).  A plaintiff must support "each element" of standing with "the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). "[A]t the motion-to-dismiss stage, a plaintiff must allege facts that, taken as true, plausibly state that the elements of standing are met." *Hunstein v. Preferred Collection*

---

[4] The Court refrained from ruling on the litigation privilege arguments raised in the motion to dismiss due to its rulings on standing.  DE-25 p. 5.

*& Mgmt. Servs.*, 48 F.4th 1236, 1241 (11th Cir. 2022) (citations internal quotations marks omitted).

## SUMMARY OF THE ARGUMENT

Mr. Light has statutory standing under the FDCPA and FCCPA.  Although Mr. Light is a non-consumer, he falls within the FDCPA's "any person" to which a debt collector may be liable pursuant to 1692k.   Nor are the violations of sections 1692e and 1692d Mr. Light alleged in his FAC limited to consumers.  1692d explicitly protects "any person" and 1692e broadly prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt" without specifying a particular class of persons protected so long as the representation is made "in connection with the collection of any debt."

Mr. Light has Article III standing to bring his claims in federal court.  In his FAC, Mr. Light alleges concrete, particularized, and actual injuries traceable to Defendant's violations of the FDCPA and FCCPA, redressable through the relief Mr. Light requested.   Unfair and abusive debt collection practices are well documented throughout history and have been shown to damage a wide range of persons including non-debtors with whom the debtor shares a personal or professional relationship.  In enacting the FDCPA Congress provided non-consumers with a legally cognizable claims to recover damages for these injuries.  Allowing non-consumers, such as Mr. Light, to bring claims under the FDCPA and FCCPA to redress injuries they sustained as a result of debt collector misconduct serves many important objectives Congress sought to accomplish in enacting the FDCPA.

27

## ARGUMENT AND CITATIONS OF AUTHORITY

Debt collection is not new. In fact debtor creditor relationships have been a constant subject throughout recorded history. The pervasive harms caused by collection abuses are part of this history and led to many of the laws placing limitations on debt collector conduct including the FDCPA and FCCPA. These harms include injuries and damages inflicted upon non-debtor third-parties both incidentally and intentionally as part of a debt collector's efforts to collect on a debt they believe is owed.

## I.     Historical Background of Debt Collection Including Its Affect on Non-Debtors

Some of the earliest recorded laws regulated the practice of collecting debts. Under Roman law in 450 B.C., a debtor could be imprisoned, chained, displayed at market, and if none of his friends or countrymen paid his debt he could be cut up and disbursed to his creditors. *See* Roland Obenchain, *Roman Law of Bankruptcy*, 3 Notre Dame L. Rev. 169a, 174–76 (1928) *available at*: http://scholarship.law.nd.edu/ndlr/vol3/iss4/1 (describing the process upon which debts could be executed on pursuant to Table iii of the law of the Twelve Tables). Under Hammurabi's Code a creditor could seize a debtor's wife (for up to three years) to pay a debt, and creditor could seize a debtor's servant indefinitely. *See* The Code of Hammurabi King of Babylon: About 2250 B.C. §§ 113–17 (Robert Francis Harper trans., 2d ed. 1904). Under this Code if a debtor's servant died as a result of the creditor's abuse or neglect while under the creditor's care, the creditor was required to

28

pay the debtor one-third mana of silver and forfeited whatever amount the creditor had lent to the debtor. *Id.* §116. If it is determined a creditor used illegal process in his attempts to collect the creditor would forfeit all that he has lent. *Id.* §113. The Bible contains many rules for debtors and creditors; including extrajudicial consequences that existed at the time for not paying debts. *See, e.g.*, King James Bible,[5] Matthew 18:23-35 (describing some of the consequences for non-payment of a debt to include the sale or imprisonment of the debtor and his family); Deuteronomy 24:6-13 (containing limitations a creditor taking possession of certain collateral to secure payment of a debt); Exodus 22:25-27 (prohibiting usury and requiring a lender to return clothing pledged for the payment of a debt before sundown); Deuteronomy 15: 1-3, 7–9 (stating creditors shall release debts owed to them by their neighbors after seven years and that lenders should lend freely to the poor and needy whatever they need even if the year for canceling debts is near). Arguably, the colonies' relationship with England was that of a debtor to a creditor and is primarily responsible for the American Revolution. *See See* Jill Lepore, I.O.U.: How We Used to Treat Debtors, NEW YORKER (Apr. 13,

---

[5] The King James Version of the Bible is the most widely used English-language translation used during the American founding era. DANIEL L. DREISBACH, READING THE BIBLE WITH THE FOUNDING FATHERS 11 (Oxford: Oxford University Press, 2016). In a survey of American political literature from 1760-1805, a political scientist found that Bible was referenced more frequently than any European writer and accounted for about one-third of all citations in his sample. Deuteronomy was the most frequently cited book, follows by Montesquieu's *The Spirit of the Laws. Id.* at 2.

29

2009),　　http://www.newyorker.com/magazine/2009/04/13/i-o-u,　　*archived at* http://perma.cc/HGG7-ABQL.  The inscription on the Liberty Bell is a reference to the jubilee year, where people were released from the material debt they owed to others. *See* DREISBACH, p. 187.  The Liberty Bell was rung in October of 1765 to protest the Stamp Act, on July 8, 1776 prior to a public reading on the Declaration of Independence and on other auspicious occasions during the conflict with Great Britain. *Id.* p. 193.

The ability to imprisonment a debtor, through a variety of both judicial and extrajudicial processes, played an important role in coercing payments from debtors, even though it often proved ineffectual and resulted in public outrage.  *See* Roland Obenchain, at 171 (attributing the imprisonment of bankrupt, Roman citizen-soldiers to the first secession of the plebeians in 494 B.C.);  PETER J. COLEMAN, DEBTORS AND CREDITORS IN AMERICA: INSOLVENCY, IMPRISONMENT FOR DEBT, AND BANKRUPTCY, 1607–1900, at 8 (1974) (noting that imprisonment for debt sometimes forced friends and family to pay the debt and would otherwise shift the burden of caring for the debtor on friends, charity, or the public because it generally reduced the debtor's independent ability to pay the debt); *see also Imprisonment for Debt*, 11 Am. Jurist & L. Mag. 289 (1834) (reviewing the arguments for and against imprisonment for debt).  A 1641 Massachusetts law known as the "Body of Liberties" closely followed English practice, declaring of the insolvent that "his person may be arrested and imprisoned where he shall be kept at his owne charge, not the platife's till satisfaction be made." *See* Lepore, *supra archived at* http://perma.cc/HGG7-ABQL.  Laws like these required debtors had

30

to provide their own food, fuel and clothing which in many cases meant relying upon the generosity of third parties to pay for the debtor's survival. *Id.; see also* BRUCE H. MANN, REPUBLIC OF DEBTORS: BANKRUPTCY IN THE AGE OF AMERICAN INDEPENDENCE (Cambridge, MA: Harvard University Press, 2002), 86–87. Conditions within debtor's prisons were also notoriously severe. One prison in New York was described as a "human slaughter house". MANN at 86–87. In 1787, just before the Constitution was drafted, a group of New Yorkers, formed the Society for the Relief of Distressed Debtors who launched an investigation and discovered that of 1,162 debtors committed to debtors' prison in New York City in 1787 and 1788, 716 owed less than twenty shillings. *See supra,* Lepore, archived at http://perma.cc/HGG7-ABQL. Justice James Wilson, who signed the Declaration of Independence, served time in debtor's prison while he was an Associate Justice of the United States Supreme Court. *See* CHARLES PAGE SMITH, JAMES WILSON: FOUNDING FATHER, 1742-1798 (1956), 384. The practice of imprisonment for debt was abolished on at the federal level in 1833, but debt collector have continued to use other practices targets at third parties to coerce payments on a debts.

Testifying before Congress in March of 1976 under the pseudonym "James Clark" and donning a mask to further protect his identity, Mr. Clark detailed a number of tactics that debt collectors such as himself would employ to pressure consumers into paying debts. According to Mr. Clark he would threaten the debtor's family and children, he would use law enforcement or present himself as law enforcement to exert

31

additional pressure. He testified to having arrangements with judges who would allow him to use their letterhead to send communications to debtors. Hrg. On H.R. 11969, The Debt Collection Practices Act, before the Subcommittee on Consumer Affairs of the Committee on Banking, Currency and Housing, House of Representatives, 94th Cong. 2nd Sess., March 30, 1976. Mr. Clark testified he bribed attorneys for the use of their names and letterhead, threated children of consumers, told lies to family and friends of difficult 'clients,' and shouted abusive or even sexual insults over the phone. 122 Cong. Rec. 21741-42 (1976). Mr. Clark testified that local judges and police official were taking some of the 50 percent he would make on every collection in return for their help making his threats look official. *Id.*

Similar testimony was provided from other, non-masked sources. The California State Department of Consumer Affairs relayed a reports they received from a consumers that to pay their debts, debt collectors have told them they should give up their children for adoption, go on welfare, and if they still could not pay the debt that they should kill themselves. *See* Richard B. Spohn, Director of California State Department of Consumer Affairs, Sacramento, California, p. 87, Hearings Before the Subcommittee on Consumer Affairs of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, 95th Congress, First Session (Feb. 8–10, 1977). The FCC reported to receiving information that debt collectors were increasingly using telephones to collect debts including making calls to friends, neighbors, relatives, employers and children; calls demanding payments for amounts not owed; calls to

32

places of employment; and calls misrepresenting the terms and conditions of existing or proposed contracts. *Use of Telephones for Debt Collection Purposes*, Public Notice 70-609, 35 Fed. Reg. 9873 (June 10, 1970).

## II.    Debt Collection Practices Affecting Non-Debtors Since the FDCPA

While the FDCPA has certainly helped curtail abusive debt collection practices, they have continued to persist, including practices directed at third parties. Unscrupulous debt collectors use various methods and means to collect debts from consumers, which continues to include unfair and abusive debt collection practices causing injuries to the debtor's friends, family, employers, neighbors, attorneys and associates.

In a lawsuit filed by the New York State's Attorney General's office in 2009 against the Benning-Smith Group, it was alleged that of the debt collector's employees "kept repeating the name of a consumer's daughter, describing various sexual things he would do to her unless the debt was paid." Another debt collector, Tobias "Bags of Money" Boyland detailed that he would coerce consumers by threatening to arrest consumers in front of their children and by telling them that their children will be handed over to social services agencies. *See* Jake Halpern, *Pay Up: A Debt Collector Struggles to Stay Out of Debt*, NEW YORKER (Oct. 11, 2010), http://www.newyorker.com/magazine/2010/10/11/pay-up, archived at http://perma.cc/353G-DRYL (tracing the practices of a debt collector in Buffalo, New York). In addition to its effect on debtors individually, financial misery strains a

33

debtor's relationships and affects the people around them. The effects of prolonged financial problems extend not just to a debtor's family, but also to their workplaces and communities. Existing in a state of money scarcity continues to damage people's ability to lead productive lives. *See* Pamela Fooley et al., ARTICLE: LIFE IN THE SWEATBOX, 94 Notre Dame L. Rev. 219, 255-257.

Advocating for the passage of earlier version of the Fair Debt Collection Practices Act Congressman Annuzio stated the law "…will assure that they get a fair break when they owe money, and that collection of 'hard core' debts takes place lawfully in the courtroom, and not by threats, obscenity, and lies." 122 Cong. Rec. 21741–42 (1976). U.S. Rep. Annuzio could not have anticipated the influx of collection litigation that would ensue, or that courtrooms would eventually become a significant forum for debt collector abuses. In 2005, 60% of the more than 120,000 small claims cases filed in Massachusetts were filed by debt collectors. As of June of 2008 more than 119,000 civil lawsuits against debtors were pending in Cook County, Illinois including 12,000 assigned to a single judge. See U.S. FED. TRADE COMM'N, COLLECTING CONSUMER DEBTS: THE CHALLENGES OF CHANGE-A WORKSHOP REPORT 55 (Feb. 2009), *available at* http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf

"In courts throughout the United States, a small number of private companies account for a large percentage of all civil litigation filed in courts of general jurisdiction." ARTICLE: ASSEMBLY-LINE PLAINTIFFS +, 135 Harv. L. Rev. 1704, 1731. A

34

survey of available data in 2019 from trial courts from eighteen (18) states found that on average twenty-three percent (23%) of debt suits in each state are brough by just ten corporate plaintiffs. ARTICLE: THE DEMOCRATIC (IL)LEGITIMACY OF ASSEMBLY-LINE LITIGATION, 135 Harv. L. Rev. F. 359, 359. These corporate plaintiffs bring "tens or hundreds of thousands of claims a year and ha[ve] instituted routinized, assembly-line methods for railroading pro se defendants." *Id.* at 359. According to the survey, the top three filers across the eighteen (18) states surveyed filed more than 295,000 civil cases which is more than the total number of civil cases filed by all parties in all federal district courts in 2019. ASSEMBLY-LINE PLAINTIFFS +, at 1732. LVNV filed 64,015 cases across the eighteen (18) states surveyed. *Id.* at 1733. State small claims courts are overwhelmed. *See* RICK JURGENS & ROBERT J. HOBBS, NAT'L CONSUMER L. CTR., THE DEBT MACHINE: HOW THE COLLECTION INDUSTRY HOUNDS CONSUMERS AND OVERWHELMS COURTS 12-16 (2010) *available at* [https://perma.cc/SMR4-Q6G5]. Inundating civil courts with millions of debt collection lawsuits causes many unfair debt collection practices to evade review as Judges are not equipped to adjudicate cases under conditions of asymmetrical representation. *See* ASSEMBLY-LINE LITIGATION, 135 Harv. L. Rev. F. at 365. These practices include sewer service, robo-signing of affidavits in support of claim, and pursuing claims for unenforceable debt. *Id.*; ASSEMBLY-LINE PLAINTIFFS +, at 1746–50 (collecting examples of unfair debt collection practices caused by assembly-line litigation). In the context of the bankruptcy proofs

35

of claims, this Court noted an analogous practice, debt collectors filing proofs of claims they knew were outside the applicable statute of limitations periods. *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1256 (11th Cir. 2014) ("A deluge has swept through U.S. bankruptcy courts of late. Consumer debt buyers—armed with hundreds of delinquent accounts purchased from creditors—are filing proofs of claim on debts deemed unenforceable under state statutes of limitations.") *overruled in part by Midland Funding, LLC v. Johnson*, 581 U.S. 224, 137 S. Ct. 1407, 197 L. Ed. 2d 790 (2017).

The Supreme Court has expressly held that FDCPA applies to the litigating activities of debt collection lawyers. *Heintz v. Jenkins*, 514 U.S. 291, 294, 115 S. Ct. 1489, 1490, 131 L. Ed. 2d 395 (1995). Upon review of the FDCPA after Congress amended it post *Heintz*, this Court held confirmed that:

> Both the clear language chosen by Congress and the Supreme Court's explicit pronouncement in *Heintz* compel the conclusion that the FDCPA applies to all litigating activities of debt-collecting attorneys, subject only to § 1692e(11)'s express exemption.

*Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1299–300 (11th Cir. 2015) (citations omitted). In *Miljkovic*, this Court also tackled a number of other questions of statutory interpretation, namely whether the FDCPA applies to conduct directed at someone other than the consumer. *Id.* at 1295. Applying FDCPA to conduct and representations made to a consumer's attorney advances the FDCPA's goal to "to eliminate abusive debt collection practices" and "to protect consumers against debt collection abuses," 15 U.S.C. § 1692(e), and also encourages the involvement of attorneys. *See Bishop v. Ross*

36

*Earle & Bonan, P.A.*, 817 F.3d 1268, 1273 (11th Cir. 2016); *see also* 15 U.S.C. § 1692c(a) ("[A] debt collector may not communicate with a consumer in connection with the collection of any debt . . . if the debt collector knows the consumer is represented by an attorney . . . ."); *Id.* § 1692b (explaining that when a consumer is represented by an attorney, a debt collector seeking location information "shall . . . not communicate with any person other than that attorney"). Conversely, when debtors in debt collection cases proceed *pro se*, consumers have less protections and debt collection abuses are more likely to go undetected, as the state court often cedes "undue power to the assembly-line debt buyer to control the facts and evidence considered." ASSEMBLY-LINE LITIGATION, 135 Harv. L. Rev. F. 359, 365.; *see also* Jessica K. Steinberg, *A Theory of Civil Problem-Solving Courts*, 93 N.Y.U. L. REV. 1579, 1596-97 (2018) (noting that a number of jurisdictions report up to ninety-nine percent of defendants in debt cases appear *pro se*).

III.  **Mr. Light has Statutory Standing to Bring his Claims against LVNV and Defendant Firm's Violations of 1692e, 1692d, and 559.72**

Congress provided non-consumers, including attorneys like Mr. Light, the right to seek relief for a debt collector's violations of the FDCPA. The FDCPA does not limit the availability of its remedies to debtors, consumers, or a specific class of people, rather "any person" is entitled to relief. Mr. Light is "any person" who has statutory standing to bring his claims because 1) he was directly exposed to their injurious conduct; and 2) he stood in the consumer's shoes when the violations occurred. The

District court erred in ruling that Mr. Light did not have statutory standing to obtain relief under the FDCPA for LVNV and Defendant Firm's violations of the §1692e, §1692d, and §559.72.

Federal Courts interpret the FDCPA consistent with "[their] obligation to construe consumer protection statutes broadly in favor of consumers." *Agrelo v. Affinity Mgmt. Servs., LLC*, 841 F.3d 944, 950 (11th Cir. 2016); *see also, e.g., Urbina v. Nat'l Bus. Factors Inc.*, 979 F.3d 758, 763 (9th Cir. 2020) (noting the FDCPA is "broadly remedial" and should be construed "liberally" in favor of consumers); *Manuel v. Merchants & Prof'l Bureau, Inc.*, 956 F.3d 822, 826 (5th Cir. 2020); *DiNaples v. MRS BPO, L.L.C.*, 934 F.3d 275, 281 (3d Cir. 2019); *Taylor v. Fin. Recovery Servs., Inc.*, 886 F.3d 212 (2d Cir. 2018); *Wise v. Zwicker & Assocs.*, P.C., 780 F.3d 710 (6th Cir. 2015); *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385 (4th Cir. 2014).

In passing the FDCPA, Congress found "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices.' 15 U.S.C. § 1692(a). "Disruptive dinnertime calls, downright deceit, and more besides drew Congress's eye to the debt collection industry. From that scrutiny emerged the Fair Debt Collection Practices Act, a statute that authorizes private lawsuits and weighty fines designed to deter wayward collection practices." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 81, 137 S. Ct. 1718, 198 L. Ed. 2d 177 (2017).

### A. *Mr. Light, and other Non-Consumers, are Within the Zone of Interest Congress Sought to Protect Under the FDCPA*

To invoke a statutory cause of action, a plaintiff must be within the "zone of interests" that the statute protects. *Lexmark Int'l, Inc.* v. *Static Control Components,* Inc., 572 U. S. 118, 129, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).   "Put differently, a plaintiff must belong to the class of persons to whom the statute grants a right to sue." *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1990-91 (2025) citing *Lexmark*, at 127, 134 S. Ct. 1377, 188 L. Ed. 2d 392.  This question requires the Court to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.  *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196-97, 137 S. Ct. 1296 (2017) (citations omitted).

The statutory phrase "with respect to any person" is properly understood to encompass all persons. *Miljkovic.*, 791 F.3d at 1302 (11th Cir. 2015) (citation omitted).

> The phrase "with respect to" is a longer way of saying "respecting." *Respecting* means "with regard or relation to: REGARDING, CONCERNING." *Webster's Third New International Dictionary Unabridged* 1934 (1993 ed.). The scope of "with respect to" is necessarily broader than terms such as "based on," "under," or "pursuant to."

*Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 948 (Fla. 2020).  In a case involving the interpretation of a provision of the bankruptcy code the Supreme Court has recently recognized— "[u]se of the word 'respecting' in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct.

1752, 1760, 201 L. Ed. 2d 102 (2018). The Court held that a statement regarding a single asset is a "statement . . . 'respecting' a debtor's financial condition [because] it has a direct relation to or impact on the debtor's overall financial status." *Id.* at 1761. In reaching this conclusion, the Court rejected an argument that a narrow sense of "respecting" should be employed in interpreting the statutory provision. *Id.* at 1759; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) (holding that "ordinary meaning" of statutory phrase "relating to" "is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' Black's Law Dictionary 1158 (5th ed. 1979)—and the words thus express a broad . . . purpose"); *accord Ham*, 308 So. 3d at 948-49 (Fla. 2020).

"[I]f 'any person' is entitled to redress under the FDCPA, then all persons must be entitled to protection under it—be it the consumer under §1692c, *see Wright*, 22 F.3d at 649 n.1, or any person who is mistreated in the connection with the collection of any debt under §§ 1692d-1692f." *Miljkovic,* 791 F.3d at 1302 (11th Cir. 2015) citing *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999) ("[W]e read the statute to give full effect to each of its provisions. . . . [and] look to the entire statutory context."). "By painting § 1692k with broad strokes, Congress ensured that debt collectors could be held liable to consumers and non-consumers alike for violations of the Act's conduct-regulating provisions." *Id.*; *Todd v. Collecto, Inc.*, 731 F.3d 734, 737 (7th Cir. 2013) (noting that the FDCPA's text, legislative history, and much appellate precedent interpreting it

40

demonstrate that the statutes protections extend to "any person" under certain provisions of the statute). *Cf., e.g., FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1990-91 (2025) (collecting examples and holding that "any person adversely affected" by FDA's denial included retailers whose interest is "arguably" protected by the statute had statutory standing); *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 153, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970) (holding anyone adversely affected includes anyone "arguably within the zone of interests to be protected or regulated by the statute"); *Bank of America Corp.* v. *Miami*, 581 U. S. 189, 193, 137 S. Ct. 1296, 197 L. Ed. 2d 678 (2017) (holding that the City of Miami fell within the interests of any "aggrieved person" that the FHA sought to protect).

"The FDCPA provides a private right of action to 'any person' who is harmed by a 'debt collector' who violates its provisions. The FDCPA's liability provision is 'in no way limited to conduct and communications directed only to consumers.'" *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1285 (11th Cir. 2025) (quoting 15 U.S.C. § 1692k and *Miljkovic*, 791 F.3d at 1302 (11th Cir. 2015) (internal citation omitted)). "By painting § 1692k with broad strokes, Congress ensured that debt collectors could be held liable to consumers and non-consumers alike for violations of the Act's conduct-regulating provisions." *Miljkovic*, 791 F.3d at 1302; *accord Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th at 1285. The text of the statute is clear, but so is the legislative history:

> This bill also protects people who do not owe money at all. In the collector's zeal, collection efforts are often aimed at the wrong person either because of mistaken identity or mistaken facts. **This bill will make**

41

**collectors behave responsibly towards people with whom they deal**. Another group of people who do not owe money, but who may be deliberately harassed are the family, employer and neighbors of the consumer. These people are also protected by this . . . bill.

H.R. Rep. No. 131, 95th Cong. 1st Sess. 8 (emphasis added).  Requiring debt collectors to behave responsible toward *any person* with whom they deal protects, protects consumers and any other person who could be harmed by an improper collection debt practice.  *Id.*; *see also Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1178 (11th Cir. 1985) (noting that one of the purposes of the FDCPA is that every individual, whether or not he owes the debt, has a right to be treated in a reasonable or civil manner). When it passed the FDCPA Congress intended to provide protections to the consumer as well as their friends, neighbors, employers and any person who is subjected to debt collector harassment and abuse.  S. Rep. No. 382, 95th Cong. 1st Sess. 2.  The FDCPA even protects "**debt collectors** who refrain from using abusive debt collection practice" by ensuring they are not competitively disadvantaged.  15 U.S.C. 1692(e) (emphasis added).

Congress included a private right of action in the FDCPA to make the legislation "primarily self-enforcing". S. Rep. No. 382, 95th Cong. 1st Sess. 2, 5.  Immediately prior to the FDCPA becoming law, only a small number of State statutes regulating debt collectors provided a civil remedy to persons affected.  *Id.*  Providing the broad private right of action ultimately serves the statutes' broad remedial purpose of protecting consumers.

### B. Mr. Light's Claims Are Actionable Under the FDCPA

This Court analyzed the provisions of the FDCPA applicable to Mr. Light's claims in *Miljkovic v. Shafritz & Dinkin, P.A.* In *Miljkovic* the Eleventh Circuit discussed the language of §1692d, §1692e and §1692f and ultimately concluded that the FDCPA prohibits debt collectors from engaging in conduct prohibits in these sections regardless of who their actions are directed towards. 791 F.3d 1291, 1301 (11th Cir. 2015). The Court noted that pursuant to 1692k "any person" harmed by the violations are entitled to redress under the FDCPA. *Id.* at 1302. "In the absence of any language to the contrary, a consumer's attorney is undoubtedly 'any person.'" *Id.* at 1300 (11th Cir. 2015).

In reading the language of 1692e, the Court determined its proscriptions applied to any prohibited representation, regardless of to whom it is directed, so long as it is made in connection with the collection of any debt. *Id.* at 1301. Additionally, the Court noted that the plain language of 1692d that "A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse **any person** in connection with the collection of a debt" did not limit the class of persons protected by the statute, the protection is universal:

> Given the phrase "any person," § 1692d's universal application could not be clearer. See *Evory v. RJM Acquisitions Funding L.L.C.,* 505 F.3d 769, 773 (7th Cir. 2007) (emphasizing § 1692d's reference to "any person"). On its face, § 1692d is not a protection for consumers alone; it ostensibly protects any person from being harassed, oppressed, or abused by a debt collector in connection with the collection of a debt. **In the absence of any language to the contrary, a consumer's attorney is undoubtedly**

43

> **"any person."** Cf. 15 U.S.C. § 1692c, (d) (restricting application of section to consumers and "the consumer's spouse, parent (if the consumer is a minor),   guardian, executor, or administrator")

*Miljkovic*, 791 F.3d 1291, 1300-01 (11th Cir. 2015) (emphasis added).  Accordingly, "any person" harmed by a debt collectors' violations of 1692d and 1692e (as well as others not applicable here) has statutory standing to bring a claim.  This includes when a consumer's attorney files suit in his individual name against a debt collector who engaged in conduct proscribed by the FDCPA in pursuit of collecting a consumer debt from the attorney's client.  *Light v. Seterus, Inc.*, 337 F. Supp. 3d 1210, 1213 (S.D. Fla. 2018) (holding that Gregory Light, Esq. as his client's attorney has standing to bring suit for a debt collector's violation of 1692d of the FDCPA even though he was not the consumer).

While there are number of opinions from other circuits and district courts which hold that non-consumers do not have statutory standing to bring a claim for violations of sections of the FDCPA, *e.g.* §1692c or §1692g, Mr. Light did not allege claims against LVNV or Defendant Firm for violating these provisions.  Mr. Light brought claims for LVNV and Defendant Firm's violations of the §1692d which protects "any person".  *See Miljkovic,* 791 F.3d at 1300-01 (11th Cir. 2015) ("On its face, § 1692d is not a protection for consumers alone; it ostensibly protects *any person* from being harassed, oppressed, or abused by a debt collector in connection with the collection of a debt. In the absence of any language to the contrary, a consumer's attorney is undoubtedly "any person.").  Mr. Light also brought claims for LVNV and Defendant Firm for violating

44

§1692e which also protects "consumers and other persons alike." *Id. (*"As such, §1692e is naturally read to bar "any" prohibited representation, regardless of to whom it is directed, *so long as* it is made "in connection with the collection of any debt."). This Court has characterized section 1692e as having a "broad scope" with "broad prohibitions." *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1261 (11th Cir. 2014*), overruled on other grounds by Midland Funding, LLC v. Johnson*, 581 U.S. 224, 137 S. Ct. 1407, 197 L. Ed. 2d 790 (2017); *see also Rivas v. Midland Funding, LLC*, 842 F. App'x 483, 490 (11th Cir. 2021). Indeed, section 1692e prohibits the use of "any false, deceptive, or misleading representation or means" in connection with the collection of any debt. 15 U.S.C. § 1692e. The "broad scope" of this language is big enough to include false or deceptive indirect communications. *Rivas*, 842 F. App'x at 490 (11th Cir. 2021)

> The FDCPA's statutory text does not provide nor does it imply immunity for debt collection practices otherwise forbidden by the Act simply because those debt collection practices are directed at a consumer's attorney or any other non-consumer. Appellees' contention that attorneys representing consumers are excluded from the class of persons to whom a debt collector may not direct conduct prohibited under §§ 1692d-1692f finds no support in the plain language of the Act.

*See Miljkovic,* 791 F.3d at 1301. (11th Cir. 2015). *Cf. Magdy v. I.C. Sys.*, 47 F.4th 888 (8th Cir. 2022) (holding that an attorney who had no relationship with the consumer-debtor whatsoever did not have statutory standing to bring an FDCPA claim for a debt collector's violation of §1692c(b)).

i.        *Mr. Light's False and Misleading Representation Claims Under §1692e*

In Count I his FAC, Mr. Light brings claims or LVNV and Defendant Firm's violations sections 1692e, 1692e(2), 1692e(5), 1692e(8), 1692e(10) and 1692e(15) of the FDCPA.  The FAC's factual allegations alleged in support of the claims brought under 1692e all derive from false, deceptive, and/or misleading representations and means that LVNV and Defendant Firm used in their attempts to collect a debt from Mr. Light's client.  On August 22, 2023, Mr. Light appeared in the Debt Collection Lawsuit on behalf of Mr. Rodriguez, and notified LVNV through their counsel at Defendant Firm that Mr. Light would be representing Mr. Rodriguez.   DE-7-¶49.  Thereafter, pursuant to 15 U.S.C. §1692a(2) and 15 U.S.C. §1692c(a)(2), Mr. Light and his law firm became a medium for all of LVNV and Defendant Firm's communications and debt collection activities.  *See Evory v. RJM Acquisitions Funding L.L.C.,* 505 F.3d at 773 (7th Cir. 2007) (explaining that if a debt collector knows that the consumer is represented by an attorney then he generally may not communicate with the consumer directly). LVNV and Defendant Firm's communications and debt collection activities were required to be sent directly to Mr. Light, who shares and explains the communications with his client Mr. Rodriguez. *See id.*  From August 22, 2023 onward, this is precisely what occurred; all of LVNV and Defendant Firm's communications and other debt collection activities made in connection with the collection of the debt or the Debt Collection Lawsuit were sent directly to Mr. Light who then relayed the information to his client.  DE-7-¶¶49–90.  Under the FDCPA, Mr. Light and Mr. Rodriguez are legally

46

distinct entities. *See Guerrero v. RJM Acquisitions LLC,* 499 F.3d 926, 935 (9th Cir. 2007). Mr. Light is both "any person" and "any medium" for a debt collectors' "communications" with Mr. Rodriguez.

In Count II Mr. Light brings claims for Defendant Firm's violations §1692e(5) distinct to Defendant Firm.    Mr. Light alleges all of Defendant Firm's actions attempting to collect the debt during this time period were illegal because Defendant Firm was not registered as a consumer collection agency pursuant to Florida Stat. §559.553(1).    DE-7-¶¶91–105.

### ii.    *Mr. Light's Harassment and Abuse Claims Under §1692d*

In Count III Mr. Light brings claims against LVNV and Defendants Firm for engaging in conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt in violation 15 U.S.C. § 1692d. In his FAC, Mr. Light alleges a pattern of harassment and abuse.    LVNV and Defendants Firm's multiple misrepresentations, false promises, actions and inactions had the natural consequence of pressuring and intimidating Mr. Rodriguez. DE-7-¶108. This conduct also weighed heavily on Mr. Light's mind and spirit on both a personal and professional level. DE-7-¶109.     to Mr. Light to induce his inaction and in furtherance of obtaining a judgment.    LVNV and Defendants Firm submitted motions and sworn affidavits even after the parties resolves their dispute.    After the judgment was entered, and Mr. Light sought to have the judgment vacated, for months LVNV

and Defendants Firm did nothing.  Overall LVNV and Defendants Firm's actions, representations, misrepresentations, and misconduct was highly offensive and vexatious.  DE-7-¶110.

### iii.    Mr. Light's FCCPA Claims Are Also Actionable

In Count IV Mr. Light brings claims against LVNV and Defendants Firm Count IV is for Defendants' violations Fla. Stat. §559.72(9) for claiming, attempting, and threatening to enforce a debt they knew was not legitimate, and for asserting the existence of legal rights they knew did not exist.  At the District Court, LVNV and Defendant Firm argued that the analysis of Mr. Light's FCCPA claims are the same as for his FDCPA claims.  They did not argue an additional legal basis for the dismissal of these claims.  The District Court's dismissal of the FCCPA claims was also based upon Mr. Light's lack fo standing under the FDCPA. *See* DE 25 p. 7. ("And since Mr. Light lacks standing under the FDCPA, he similarly would lack standing under the FCCPA. *See Condon v. Global Credit & Collection Corp.*, 2010 WL 5071014, at *6 (M.D. Fla. 2010)). Although the statutes certainly contain different language, LVNV and Defendant firm did not explain or develop any statutory standing arguments as to why the analysis should be treated differently and therefore their arguments should be deemed waived. *See Melford v. Kahane & Assocs.,* 371 F. Supp. 3d 1116, 1126 n.4 (S.D. Fla. 2019).

Mr. Light's claims under §§1692e and 1692d and his claims under the FCCPA all protect Mr. Light, and other non-consumers, from debt collector misconduct.

> In sum, not one of the three sections at issue here "designate[s] any class of persons, such as lawyers, who can be abused, misled, etc., by debt collectors with impunity." *See Evory*, 505 F.3d at 773. The FDCPA's statutory text does not provide nor does it imply immunity for debt collection practices otherwise forbidden by the Act simply because those debt collection practices are directed at a consumer's attorney or any other non-consumer. Appellees' contention that attorneys representing consumers are excluded from the class of persons to whom a debt collector may not direct conduct prohibited under §§ 1692d-1692f finds no support in the plain language of the Act.

*Miljkovic*, 791 F.3d at 1301 (11th Cir. 2015). Consequently, Mr. Light and his specific claims fall within the FDCPA's zone of interest and are actionable.

## C. The District Court's "Injurious Exposure" Pleading Requirement Is Erroneous

The District Court erred when it applied a requirement that Mr. Light plead "injurious exposure" to demonstrate his statutory standing to bring his claims. Neither this Court's precedent nor any binding authority contains such a rule. Moreover, even if the this standard were to apply, the facts alleged in Mr. Light's FAC satisfy it.

The District Court cites multiple, unpublished opinions to support its ruling that Mr. Light must plead "injurious exposure" to the illegal debt collection activity to demonstrate his statutory standing to bring claims under the FDCPA. DE 25 p. 6. The first case the District Court cites is an unpublished opinion which neither uses the term "injurious exposure" nor does it address statutory standing. *See Estate of Burpo v. Specialized Loan Servicing, LLC*, 2025 U.S. Dist. LEXIS 58810, 2025 WL 949108 (N.D. Ala. 2025). Instead, the particularized injury discussion in *Burpo* concerns Article III

49

standing.  The Motion to Dismiss did not raise Article III standing.  *See*, *generally* DE 18 (notably absent from the motion and the reply are terms like Article III, injury in fact, particularized injury, or redressability).  Of course the District Court was free to address its subject matter jurisdiction under Article III *sua sponte*, *see AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007), but a review of the District Court's Order might suggest the District Court mistakenly conflated "statutory standing" under the FDCPA (the argument raised by LVNV and Defendant Firm in their Motion to Dismiss DE18 and Reply DE-23) with Article III standing. Statutory standing is distinct from Article III standing.  *See* 979 F.3d No. 22-11923, 2023 U.S. App. LEXIS 23976, 2023 WL 5844958, at *4 (11th Cir. Sept. 11, 2023). Indeed, "[s]tatutory standing is not really about standing at all, in the sense that it limits a 'court's statutory or constitutional power to adjudicate the case.'" "[S]tatutory standing is nothing more than an inquiry into whether the statute at issue conferred a 'cause of action' encompassing 'a particular plaintiff's claim.'" *Emor*, 785 F.3d at 677 (citation omitted). In other words, "statutory standing' is itself a merits issue.'" *Id.* (quoting *United States v. Oregon*, 671 F.3d 484, 490 n.6 (4th Cir. 2012)). The requirement that Mr. Light plead a particularized injury that is "fairly traceable to the challenged conduct of defendant" on the other hand, is an element of Article III standing.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547 (2016). Article III standing is discussed in more detail, *infra*.

Another case the District Court cites is from the Second Circuit, *Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C.*, 155 Fed. Appx. 10 (2nd Cir. 2005). The court in *Sibersky* explains that Mr. Siberksy's amended pleading did not allege any exposure the offending debt collection letters and any damages caused by the exposure, rather only his wife, Ms. Sibersky is alleged to have received and read the letters at issue. *Sibersky,* at 11–12.

*Sibersky* stands in stark contrast to the facts alleged in Mr. Light's FAC. In Mr. Light's FAC alleged direct exposure to all of LVNV and Defendant Firm's offensive debt collection activities. DE-7 ¶¶49, 50, 53, 61–65, 69, 83–85; DE-7-2 pp. 14-15; DE 7-7 pp. 8-9. Mr. Light received, read, and responded to their communications. DE-7 ¶69. Mr. Light acted in reliance upon LVNV and Defendant Firm's representations and actions. Mr. Light alleges tangible and intangible harms caused as a direct consequence of this debt collection activity. DE-7 ¶¶70–71, 74–80, 108–111; DE-7-1 p. 29. Much less was alleged in, *Bank v. Pentagroup Financial, LLC*, another unpublished opinion where the court held the plaintiff had alleged injurious exposure for state a claim under §1692d. 2009 U.S. Dist. LEXIS 47985, 2009 WL 1606420, at *5.

The court in *Scalfani* which is also unpublished, and is also the only opinion in this circuit that uses the term "injurious exposure" and the FDCPA, held that to meet the "injurious exposure" requirement it was sufficient for a non-consumer to plead that they merely received the offending calls and messages. *Sclafani v. BC Services, Inc.*, 2010 U.S. Dist. LEXIS 115330, 2010 WL 4116471, at *3 (S.D. Fla. 2010). The court

specifically declined to require the plaintiff to allege "actual harm" cause by the calls and messages. *Id.* To the extent this District Court intended these points to implicate Article III standing, these issues are addressed *infra.*

### D. Mr. Light Stood in the Consumer's Shoes as his Attorney in the Debt Collection Lawsuit

Finally, Mr. Light's position as the consumer's attorney and legal representative in the Debt Collection Lawsuit is further proof of his statutory standing. Mr. Light stood in the consumer's shoes given the nature and scope of his representation. As a natural consequence of his legal representation, Mr. Light was on the receiving end of all of communications, actions and practices, that would have otherwise been directed at his client.

The Fourth Circuit led a contingent of courts, including the Eleventh Circuit, in holding that "the FDCPA covers communications to a debtor's attorney." *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 233 (4th Cir. 2007); *accord Evory*, 505 F.3d at 775 (7th Cir. 2007) (holding that a "letter [that] misrepresents the unpaid balance of the consumer's debt . . . would be actionable whether made to the consumer directly, or indirectly through his lawyer" in circumstances where, for example, the "false claim [would] be as difficult for a lawyer to see through as [the] consumer"); *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 (3d Cir. 2011) ("A communication to a consumer's attorney is undoubtedly an indirect communication to the consumer" that is covered by the FDCPA.); *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1272

(11th Cir. 2016) ("We join the Third, Fourth, and Seventh Circuits in holding that a debt-collection notice sent to a consumer's attorney is" a communication covered by the FDCPA.).

While it "[a] consumer and his attorney are not one and the same for purposes of the Act", and instead under the FDCPA they are treated as "legally distinct entities." *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 935 (9th Cir. 2007), "courts have extended [the FDCPA's] prohibitions to some statements made to a consumer's attorney, and to others who can be said to standing in the consumer's shoes". *O'Rourke v. Palisades Acq. XVI, LLC*, 635 F.3d 938, 943 (7th Cir. 2011) (internal citations omitted); *see also Wright v. Fin. Serv. of Norwalk, Inc.*, 22 F.3d 647, 650 (6th Cir. 1997) (en banc) (holding that executrix could sue because the Act applies to anyone who "stand[s] in the shoes of the debtor [with] the same authority as the debtor to open and read the letters of the debtor").

The FDCPA defines "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." § 1692a(2) (emphasis added). When a consumer's lawyer is the recipient of information regarding a debt, the lawyer is both a person and also medium of indirect communication to the consumer. *Evory,* 505 F.3d at 773 (7th Cir. 2007).

"The attorney is a conduit to the consumer; thus, a debt-collection letter sent to the consumer's attorney is an indirect communication with the consumer." *Bishop*, 817 F.3d at 1272 (11th Cir. 2016).

53

Here, Mr. Light stood in Mr. Rodriguez's shoes after he appeared in the Debt Collection Lawsuit. He became the medium of all communications intended for Mr. Rodriguez and any debt collection practices, including practices and communications that occurred in litigation. Consequently, standing in Mr. Rodriguez's shoes, Mr. Light has statutory standing to bring his claim.[6]

## IV.     Mr. Light Has Article III Standing to Bring his Claims in Federal Court

The District Court's Order also made a brief mention that Mr. Light's injuries were insufficient to satisfy Article III standing. DE 25 p. 7. The issue was not argued or briefed by LVNV, Defendant Firm, or Mr. Light, but was raised *sua sponte* by the District Court. In a single sentence the District Court held: "In the legal profession, a claim of stress and mental anguish by a lawyer on a side that didn't have the case go smoothly does not equate to Article III standing." DE-25 p. 7. This portion of the District Court's ruling was also erroneous because Mr. Light's claims in his FAC show injuries in fact traceable to LVNV and Defendant Firm's conduct that are likely to be redressed by a judicial decision for Mr. Light.

---

[6] This Court adopted the least sophisticated consumer standard for determining whether a debt collector has violated the FDCPA, even when communications were sent to a consumer's attorney. In *Bishop* and *Miljkovic*, the FDCPA claims were brought by the consumer (rather than his attorney), and arguably a different standard, *e.g.* the "competent lawyer" standard, could apply when evaluating Mr. Light's claims. However, the facts and claim alleged in Mr. Light's FAC would satisfy either standard.

To show Article III standing a plaintiff must allege three elements at an "irreducible constitutional minimum" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (quotations omitted). Those three elements are (1) an injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a judicial decision for the plaintiff. *Id.* The District Court's appears to only take issue with the first element in its Order.

An injury in fact must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021). To determine whether a harm is concrete, "courts should assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* (quotations omitted). In other words, we look for a "close historical or common-law analogue for their asserted injury." *Id.* The easiest Article III injuries to identify are "traditional tangible harms, such as physical harms and monetary harms." *Id.* Harder to pin down, but equally viable, are intangible harms, such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* Whether tangible or intangible, so long as there is a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," there can be an injury in fact. *Id.*

"The big takeaway from this analysis is that Congress may elevate certain nontraditional harms to 'legally cognizable injuries,' but 'it may not simply enact an injury into existence, using its lawmaking power to transform something that is not

55

remotely harmful into something that is.'" *Davis v. Prof'l Parking Mgmt. Corp.*, No. 22-14026, 2023 U.S. App. LEXIS 17944, at \*4 (11th Cir. July 14, 2023) (citing *TransUnion* at 2204-05 (quotations omitted)).

### A. Debt Collection Practices Have Been at Center of Cases and Controversies Throughout History and Served as Basis to Seek Redress in A Lawsuit

As discussed *supra* in Part I, debt collection is not new; debt collection regulation has been a constant subject throughout recorded history, and at the heart of countless "cases" and "controversies", including in 1787 when Article III was being drafted. The pervasive harms caused by debt collection tactics, including their effects on non-debtors, was widely recognized, even when the tactics had not yet been made illegal.

Debt collection and bankruptcy laws were discussed at the constitutional convention in 1787. *See* James Madison, Notes of Debates in the Federal Convention of 1787, *in* 2 The Records of the Federal Convention of 1787, at 489 (Max Farrand ed.) ("'The clause in the Report 'To establish uniform laws on the subject of Bankruptcies' being taken up. Mr. Sherman observed that Bankruptcies were in some cases punishable with death by the law of England-- & He did not chuse to grant a power by which that might be done here. Mr. Govr Morris said this was an extensive & delicate subject. He would agree to it because he saw no danger of abuse of the lower by the Legislature of the U—S." The clause was agreed to 9-1, with Mr. Sherman (Connecticut) opposed). Bankrtupcy and insolvency laws were discussed in the Federalist Papers. *See* The Federalist No. 42 (James Madison) ("The power of establishing uniform laws of

bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question."). 3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §§ 1100–1110 (1833) (discussing the history of the bankruptcy clause, bankruptcy and insolvency laws throughout history, including the controversies surrounding these laws in the United States).

"[T]he delegates at the Constitutional Convention had just lived through Shays's Rebellion, an uprising of farmers protesting debt-collection courts in Massachusetts." *Atkinson v. Garland*, 70 F.4th 1018, 1032 (7th Cir. 2023). Given the importance that debtor-creditor relationships played in Colonial history it is fair to say that all aspects of debt collection, including fell within the purview of the Article III's "cases" and "controversies" terminology. This is true even where conduct had not yet been made illegal, and where a cause of action that debtors or third parties could bring in court was yet to exist. Even though Article I provided the legislature with express permission to enact laws on the subject of bankruptcy, it took until the year 1800 for Congress to agree on a law. That law, the short-lived Bankruptcy Act of 1800 also appears to have included private right of action for a "party aggrieved" to bring against a creditor if the debtor placed into bankruptcy was not actually bankrupt or if the debt the creditor claimed it was owed was not actually due. *See* 2 Stat. 19 §2. ("And if such debt shall not be really due, or after such commission taken out it cannot be proved that the party was

57

bankruptcy, then the said judge shall, upon the petition of the party aggrieved, in case there be occasion, deliver such bond to the said party, who may sue thereon, and recover such damages, under the party of the same, as upon trial at law, he shall make appear he has sustained, by reason of any breach of the condition thereof.").  Even absent a statutory cause of action, many court's have recognized redressable injuries arising out of unfair debt collection practices.  *See Clark v. Associated Retail Credit Men*, 105 F.2d 62, 65 (D.C. Cir. 1939) (collecting cases where attempts to collect debts caused redressable, emotional injuries).

The issues surrounding debt collection and debtor-creditor relationships, including harms caused by debt collection practices have been the subject of controversy and court action throughout history.  Mr. Light's claims are no different, and therefore fall within the Article III definition of claims that can be litigated and redressed in federal court.

### B. Mr. Light's Claims Are Analogous to Common Law Claims that Provided Basis to Seek Redress in A Lawsuit

The claims and harms Mr. Light alleges in his FAC also have common law tort analogues.  These torts include invasion of privacy, defamation, emotional distress, interference with contractual relations if the employer, tortious interference with a contractual or business relationship.

Mr. Light's injuries are analogous to injuries that were historically compensable for under torts of invasion of privacy, defamation, emotional distress, tortious

interference with contractual relations, tortious interference with business relationships. The torts most closely analogous are tortious interference with a business relationship and fraud. Tortious interference with business relationships is described in the Restatement of the Law, Torts § 766 as follows:

> Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
>
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another
>
> is liable to the other for the harm caused thereby.

This Court has previously said that "consumers should not be required to bear the costs of abusive debt-collection practices" and "that excluding attorney communications from § 1692e would contravene the purpose of the FDCPA because 'the consumer, rather than the debt collector, [would] be forced to bear the costs resulting from the debt collector's conduct.'" *Bishop*, 817 F.3d at 1276-77 (11th Cir. 2016) (quoting *Miljkovic*, 791 F.3d at 1304). This category of harm, increasing the costs and/or affecting the performance under a contract between the two parties, is a traditional harm redressable in an action for tortious interference with a business relationship.

Liability for fraudulent misrepresentations and non-disclosure in business transactions is described in Restatement of the Law, Torts § 525 as follows:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other

for the harm caused to him by his justifiable reliance upon the misrepresentation.

This tort is recognized as forming the basis for a claim even in the absence of a duty between the party making the statement and the party induced by the statement.

When Congress was debating the FDCPA, many of these torts were referenced by representatives from the Federal Trade Commission in their statements to Congress advocating for the passage of the FDCPA:

> Section 812, which provides for a civil cause of action by the consumer for violations of the act, is another element of the bill which we support. The importance of this statutory protection is that it would provide the harassed debtor with greater protection that the existing tort theories, such as invasion of privacy, defamation, and emotional distress, because it prohibits certain practices that might not be actionable under any tort theory.
>
> For examples, contact with the debtor's employer may not constitute interference with contractual relations if the employer does not discharge the debtor. In addition, though tort law may provide the injured debtor with recovery, skepticism towards claims for emotional and mental injury keeps the standard of proof quite high.

Statement of Lewis H. Goldfarb, Deputy Assistant Director, Division of Special Statutes, Bureau of Consumer Protection, Federal Trade Commission; Accompanied by Jared Blum, Staff Attorney, General Counsel's Office, Federal Trade Commission, *at* 274. While private civil causes of actions were available to citizens of some states, but in many states, the courts had been slow to recognize these availability of remedies for these injuries. *See* J. Shane Creamer & Joel G. Weisberg, Att'y Gen., Commonwealth of Pa., Debt Collection Abuses in Pennsylvania - The Need for No-

Threat Legislation (1971) ("Theoretically private civil actions are available intentional infliction of mental and emotional distress, invasion of privacy, intentional interference with employment relationships, and defamation.").

Mr. Light's claims and injuries are analogous to these common-law torts and others. In his FAC Mr. Light alleged the contractual relationship between himself and Mr. Rodriguez, and how LVNV and Defendant Firm's misrepresentations and unfair practices affected that relationship. Mr. Light alleges that LVNV and Defendant Firm's deceptive statements induced him into inaction which caused the default final judgment to be entered against his client. DE-7 ¶¶70–71, 74–80, 108–111; DE-7-1 p. 29. Mr. Light spent hours preparing a motion to have the resulting final judgment set aside. DE-7 ¶75–77. Mr. Light was unsure whether this additional, unnecessary time he was being forced to spend on the motion and hearing would be compensated, and their actions caused a strain on Mr. Light's relationship with his client. DE-7 ¶75.

Mr. Light has no problem answering the question: "What's it to you?". Mr. Light was harmed by LVNV and Defendant Firm's conduct. While it is fair to say that in representing consumers in debt collection lawsuits, Mr. Light voluntarily puts himself in harms way. However, this does not equate to Mr. Light having no stake in the outcome of the litigation or that his particularized harm would not be addressed with an award of damages. Mr. Light is a far cry from Deborah Laufer, the serial ADA litigant who expressly disclaimed any intention to visit the hotels who she said had failed to provide accessibility information on their websites. *Acheson Hotels, LLC v. Laufer*,

61

601 U.S. 1, 12, 144 S. Ct. 18, 26 (2023).  Instead, what occurred in the Debt Collection Lawsuit had an impact on Mr. Light both personally and professionally.  He was left feeling bamboozled and embarrassed.  His time was wasted taking corrective action to fix things directly caused by LVNV and Defendant Firm's FDCPA violations.  The injuries Mr. Light sustained from what the District Court described as the case not going smoothly, may not be of the degree of injury that debtor's or their families experienced when they were cast into debtor's prisons, but they are still the types of tangible and intangible harms to demonstrate that Mr. Light's claims fit within the definition of a "case" and "controversy".

## **CONCLUSION**

The District Court erred in dismissing the FAC because Mr. Light has statutory standing under the FDCPA and FCCPA and his FAC alleges injuries sufficient to confer Article III standing to bring his claims in Federal Court.  For all of these reasons Mr. Light respectfully requests the entry of an order reversing the District Court Order and remanding for further proceedings consistent with the Court's ruling.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, the undersigned counsel certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief contains 12,807 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 11th Circuit Rule 32-4.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Garamond, font size 14.

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25(d), Federal Rules of Appellate Procedure, this is to certify that on August 26, 2025, a copy of Appellant's Initial Brief was served on all counsel of record through the court's electronic-filing system.

By: /s/ *Gregory Light, Esq.*
**Gregory Light, Esq.**
Florida Bar. No.: 120907